All right, our next case for this morning is Continental Casualty Company against Certain Underwriters at Lloyds, and I see Mr. Trela and Mr. Mullins. So, Mr. Trela, you may proceed. Thank you, Your Honor, and I apologize. It worked yesterday, and I don't know what happened, but good morning, and may it please the Court. When parties submit a contract dispute to arbitration and arbitrators interpret and apply the party's contract to resolve that dispute, courts defer to their decisions, right or wrong, but the arbitrators must actually resolve the party's dispute and interpret and apply the contract in doing so. When they don't address the party's actual dispute and go off and apply other principles or other policies, they cede their authority, and courts have no… Are you hearing feedback, too, Your Honor? Yes. Turn that off. Okay, how about now? Does that better? Much better. Again, I apologize. When arbitrators don't interpret and apply the contract and don't actually resolve the party's dispute, they cede their authority, and as this Court has said, the courts have no choice but to vacate that decision. That's what happened here. Let me present at least a way of looking at what happened here, and you can tell me what you think about it. There's an arbitration. The arbitration is about the methodology of billing for these retention periods, whether it's going to be annual or whether it isn't after this company resolute management came in, and the original award is about that and all this talk in paragraph 2 about re-presenting, re-packaging, et cetera, and all the rest of it. And on its own, it would certainly not seem to include anything about future claims being brought, which I know is what you're concerned about. But then when Continental asked for the clarification and Interim Order No. 3 comes out, didn't they submit that issue to the arbitrators, to this past, present, and future obligations? At least as I understand this insurance arrangement, it's one of these infamous, long-tail, occurrence-based policies, and so that's why, as I understand it, your clients are concerned about future claims that have never, ever been presented but that still may fall within the scope of the policy. But if Continental gave that issue to the arbitrators at the interim order stage and the reconsideration stage, then why aren't we right back in the world of the general rule of arbitration where we defer to the arbitrators? Well, Your Honor, the reason I think is that by presenting the question to the arbitrators, by presenting any question to arbitrators, you're not agreeing that whatever decision they come up with is necessarily authorized. The final award came out, and as Your Honor noted, it did not say anything about future billings. Continental was concerned that Lloyds might seize on some language in the order to argue later that it, in fact, did cut off future billings, so we went in and asked the arbitrators to clarify that that is not what the final order provided. Now, the arbitrators denied the motion to clarify, but then they went on to add basically this prohibition on future billings. Right, so third paragraph of Interim Order 3, this language, petitioners have fully and finally discharged their past, present, and future obligations for these three accounts, Amco, Mount Vernon, and Richardson, right? Correct. But the question is, can it reasonably be read that Continental, by asking for clarification, in a sense expanded the scope of the questions that were being put to the arbitrators? No, I don't think so, Your Honor, because Continental made it clear in its motion to clarify and in the subsequent motion for reconsideration that it did not believe the arbitrators had the authority to cut off future billings or future coverage as they did. And so I think this is a situation where a party is submitting an issue to arbitration or to the arbitrators, but it's making clear that it is basically reserving, excuse me, reserving its objection to the arbitrators going off the way these arbitrators did. Again, just submitting a question to arbitrators does not concede that they have authority to resolve that question in any particular way. Continental made it very clear that it thought there was only one answer to the question. Mr. Trello, could you, I'll confess, this is my first encounter with the so-called honorable engagement clauses of reinsurance, but they're extraordinary. It's not just an agreement to skip technical rules like the oral evidence rule or the rules of evidence, but it, in essence, is an agreement to have the decision makers lay down the usual tools that lawyers and judges use to let experienced executives work out a fair solution to a dispute. That's, you know, what do you say to that's what you bargained for and that's what you got. Well, that's a fair question, Your Honor, but it's important to note that an honorable engagement clause does not grant or define any contractual rights or obligations of the parties. It's a guide for the arbitrators who are charged with resolving disputes regarding those contractual rights and obligations. But it is part of the contract. Oh, it is. And you're absolutely right, Your Honor. And on its face, the honorable engagement clause says that the arbitrators are to interpret this contract and effectuate the general purpose of this contract in a reasonable manner. So everything still circles back to the contract. The honorable engagement clause doesn't free the arbitrators from their obligation to interpret and apply the contract. You know, it says that, as the courts have said, they may not be bound by the parole evidence rule or, you know, literal or as the clause itself says, by the literal interpretation of the language. But their task is still to interpret, not rewrite the contract. I don't know about that. That's, I mean, I've got to say, as I was reading these materials, I was wondering what our Constitution would be like, what our constitutional law would be like, if there was a clause that said judges should not worry too much about the literal language, but should carry out the purposes of the preamble of the U.S. Constitution. This is a, even if these arbitrators were a little more freewheeling than we're used to seeing, that's what, that's what you bargained for, isn't it? Well, no, Your Honor, it's not what we bargained for. What we bargained for was a flexible approach to interpreting the contract, but it was still interpreting the contract. I think the PMA capital case from the Third Circuit is a good example. It was a reinsurance dispute with an honorable, the contracts had an honorable engagement clause. The parties presented a specific contractual issue to the arbitrators, and the arbitrators, apparently as a compromise, sort of dispensed with the contract provision, ordered a payment to one party that wasn't, you know, technically allowed under the contract, and the Third Circuit and the district court there said that's just too much. The honorable engagement clause does not authorize parties to just dispense with the contract altogether. So I take it you mean that, I'm just thinking sequentially in an arbitration, there's a demand for arbitration, and then there usually is, in the major arbitral bodies, a point at which the question that has been put to the arbitrators, the ICC calls it the terms of reference, and other people call it whatever they want to call it, but the question is there, and your position has to be that the question here was exclusively about billing methodology. You know, how many years were going to be included or not, et cetera, and that it wasn't about whether this was an occurrence or claims made policy, or whether for some reason claims presented on behalf of certain accounts were or were not going to be honored. I assume that such a question could have been presented to the arbitrators under this clause, but your position has to be that it wasn't, and so you don't even get to honorable engagement. Well, that's right, Your Honor, and it wasn't just our position about the issue that was presented to the arbitrators. Lloyds, in its initial arbitration demand, and this is in the separate appendix, page 3, they said the underwriters will seek a declaration as to how the limits and retentions in their annual reinsurance contracts respond to multiyear policy losses that have been or will in the future be presented to the contracts by Continental. There was never any suggestion that the answer to that question or the answer to any question presented to the arbitrators could result in a cancellation of coverage for some category of future billings. This dispute was about how do you calculate the amount of the reimbursement to which the cedant that is Continental is entitled under the reinsurance contracts, and that requires determining, you know, are you talking about one retention or a retention for each underlying policy year? Can I ask you this? Paragraph 4 of the arbitration award singles out the Brunswick claim and says that it's now closed with no amounts due, can't be represented, et cetera. I'm trying to distinguish among these five accounts that we started with, and I'm also wondering whether you made any kind of record about an estimate of how many of these new claims that fall under the scope of the policy might have been at stake. You said something about that in your brief, but I'm just wondering about the record. Sure. Well, there's not a lot in the record, Your Honor, for a couple of reasons. One is until the motion to clarify and the proceedings after that, this question of cutting off future billing was not in the case. And the other issue, of course, is that until losses have occurred, you don't actually know the amount. Now, what we do know, we have an estimate in record. There was a declaration put in at the motion to clarify stage by somebody from Resolute Management that estimated that it could be as much as I think the affidavit says either $9 or $12 million, I'm forgetting which. And that's just on the AMCO tools account. Now, two of the accounts, Brunswick being one of them and the other one being the mine safety account, there's no dispute. Those were closed. There were no possibility of future claims on those, which is why Continental didn't make an issue of that. But as to the other three, AMCO, Mount Vernon, and the Richardson, there will be claims. There are claims that are coming in. And under the plain terms of the reinsurance contracts, those claims should be covered. You're referring, I assume, to paragraph, sorry, to Article 7 in the policy, right? The agreement upon this occurrence is taking place during the time this agreement is enforced, right? Correct. Okay. Mr. Trello, if we were to agree with you that the arbitrators went too far, even under the Honorable Engagement Clause, wouldn't we have to set aside the whole award since we've got, in essence, it looks to me like a package deal, a compromise, not unusual in arbitration, and that it would be pretty unfair to just start cherry picking. Knock out the paragraphs that you don't like and leave in the paragraphs that you do like. Well, we're not asking the court to edit the final award. Our position is that it's the orders after the final award that exceed the arbitrator's authority, and those orders should be vinctated. Well, then where would that, if we agreed with you on that score, then we're just setting the stage for another round, right? Well, in a sense, I guess you are, Your Honor, and that, in fact, is how we started down this road with the motion to clarify in the first place. The panel has made very clear that they think the prohibition on future billing on several of these accounts is part of the package when you ask for that clarification. We now know that's what they wanted unanimously. So it would seem to be just fundamentally unfair, for lack of a better term, to just do that kind of cherry picking. Well, Your Honor, again, I guess I would dispute the use of the term cherry picking, because what we have here is we have a final award, and it resolved the dispute the parties actually presented to the arbitrators, which is how do you deal with the retentions question, both on the accounts that were specifically in dispute and going forward. The orders that come after that were simply beyond the arbitrator's authority. Now, as you said, the arbitrators may have viewed it as apparently viewed it as within their authority, but it was not. And so it seems to me that that should be set aside. Those orders should be set aside. Now, if the court thinks the appropriate… Mr. Treloar, can I interrupt for a second? Because, I mean, to follow up on what Judge Hamilton is saying, Continental asks for a clarification of the final award, which everybody seems to be happy with the final award. You are, and the underwriters are. But then when the arbitrators tell you how they read their own award, you're asking us to say, well, the arbitrators actually didn't read their award in an acceptable way. And that sounds very strange, you know, for somebody who spends time in the world of arbitration. You know, the arbitrators get to interpret their own award, don't they? Even if you think it's wrong, but when you buy arbitration, you buy a certain amount of error. Well, Your Honor, I don't think that it's fair to characterize what happened after the final award as clarifying or explaining the final award. And I think that's clear from the arbitration record. First of all, when Continental filed its motion to clarify right after the final award issued, the panel umpire stated that he saw Continental's point regarding future billings. Now, that's a statement that makes no sense if the final award he had just issued precluded such billings. But it's a statement that makes perfect sense, given that no one had even ever suggested that future billings could or should be cut off, given that the final award spoke only about not re-billing, which only makes sense if a bill's already been issued, and given that there's no possible conceivable connection between the retentions question that the parties did present to the arbitrators and this cancellation of future coverage. The other point, Your Honor, is that in Interim Order No. 3, the arbitrators denied the motion to clarify, which indicates that they apparently thought the final award was clear. Well, if it clearly precluded future billings, there was no need to say anything more, but they did say more. They went on and added this effectively cancellation, or as Lloyd put it, a release of Lloyd's obligation for future claims. So I think that this is not a situation of arbitrators explaining what they meant. I think it's a situation of arbitrators making a decision and then making another decision, and it's that second decision that we believe is not authorized. Okay. Do you want to save the rest of your time for rebuttal? I will do that, Your Honor. Thank you. Sure. Thank you. Mr. Mullins. Good morning. May it please the Court, Mike Mullins on behalf of Underwriters. A panel of three insurance executives held unanimously that Continental had acted in contravention of a course of dealing under the treaties. That was the main dispute in front of the panel. There were many disputes. I know Continental wants to hone in on just one. But the very first paragraph of the panel's award says that they contradicted the course of dealing under the contract, and therefore their way of billing was rejected. And then the second paragraph is the remedy, as Your Honors have noted. And the remedy was that you can't bill future losses, but not all losses, only on three specific accounts. Mr. Mullins, Mr. Mullins, in that remedy, in that remedy, did the arbitrators, would you agree the arbitrators deleted provisions from the treaties? Absolutely not. How so? Because this is a treaty that covers, when you read it, it covers all policies issued by Continental worldwide to thousands of different policyholders. But hold on, hold on, hold on for a second. I want to talk specifically about the insuring provisions. Okay. I'm not going to read the whole thing. But it talks about the billing in amount exceeding the applicable company retention as set forth in the schedule herein below provided, reinsurers shall pay to the company the applicable amount as provided in the schedule. And when they said that there were no future billings, didn't they delete the requirement from the insuring contracts that reinsurers shall pay to the company the applicable amount as provided in the schedule? The arbitrators certainly could not have concluded that they had this, you know, foresight that there were no future billings and there couldn't be any future billings. By saying that there were not going to be any future billings under the arbitration or under the treaties, didn't they have to delete that provision? That specific provision of the treaties? No, because if you look at paragraph three of the award, the panel did know there would be future billings and they did envision future billings. And paragraph three of the award tells the party exactly how those future billings should be presented. That's a how question. I mean, both paragraph three and even paragraph four left me with the feeling that the final award itself was about this billing methodology issue that prompted the arbitration to begin with. Well, first paragraph two says for the product losses as defined, you can't do it over again. That's over and done with. Those are existing claims. Future billings, paragraph three, just says do it pursuant to the aggregate extension clause unless it's an occurrence that's already happened. But this is not a claims made policy. This is an occurrence policy. So new occurrences, that's why everybody hated them and the insurance industry ditched them and there was antitrust litigation, all of which I remember. But anyway, so the future billings are possible. And the only future billing it says is closed is the Brunswick claim, which says to me, well, the original award recognizes that the AMCO tools, Mount Vernon Mills and Richardson claims, there could be a brand new claim coming in. And yet the arbitrators relieved the underwriters of the obligation to reinsure such a claim. Well, that's exactly why Continental asked for the clarification, because they read it the same way. And they said paragraph three says future billings, but paragraph two has to do with just three specific accounts. And the panel clarified that. Paragraph three is for the thousands of other accounts that are out there. But what's the point of having paragraph three if there are not going to be any future billings permitted under the reinsurance agreement for AMCO tools, Mount Vernon and Richardson? Because there will be way beyond the scope of the arbitration agreement. No, Your Honor, because there will be future billings on other accounts, Acme Corp, you know, all these other commercial insurance. As you said, these are occurrence policies, and there are thousands of other accounts out there other than AMCO, Mount Vernon and Richardson. But wouldn't you agree, though, that for those three companies, future occurrences that fall within the scope of the insuring the reinsurance agreement are now precluded because of what the arbitrators did? If they are asbestos product losses from those three accounts, they're precluded because that's the remedy for Continental. Is that a punishment? I mean, it has nothing to do with methodology. It could be a punishment. The panel was allowed to do that. But I think it was part of this overall package deal where they said you violated the course of dealing. There needs to be a consequence for that. You know, Continental says they never contemplated that. But the person who signed the treaties on their behalf, Robert Song, said, and this is a quote, the slightest suspicion that either the reinsurer or the client company is not treating the agreement as an honorable engagement puts the entire relationship in jeopardy. It may very well lead to cancellation of the contract. This is a very constrained remedy compared to cancellation of the contract. And the panel was well within their rights to be offended by this deviation from a 40-year course of conduct. And they were within their rights to say under the business judgment and what they know about the industry, this was the remedy. And by the way, it was unanimous. This isn't one industry executive with a particular view. This was three industry executives, one handpicked by Continental. All three issued that final ruling. Mr. Mullins, did Lloyd ask for that remedy? Both parties asked for remedies on future billings. Neither party asked for the remedies set forth in paragraph three or paragraph two. But that's, the remedies don't need to be specifically requested by the parties or set forth in the treaties. That's what this court said in Bavarati. Panels are usually left broad discretion as to how remedies are issued. And that's even broader when you have this honorable engagement clause. Let me ask you about paragraph two of the final award and what I'm specifically interested in is what part of the contract or what part of the treaties that this came from. When I read paragraph two, petitioners have paid the full amounts due if any. Under the extension clause. And then it talks about repackaging, representing, or otherwise rebilling. So I think you would agree that representing, repackaging, or otherwise billing has to do with prior billings, not future billings. So the only clause I think that could deal with future billings is have paid the full amount due. So what provision of the contract could the arbitrators have been interpreting to determine that Lloyds has paid the full amount due, if any, under the aggregate extension clause? Well, the honorable engagement clause in the arbitration agreement gives the panel great deference. And what they could have decided, we don't know because they didn't put forth their reasons, nor were they required to. But what they could have decided on those rebillings is that in the past, Continental had taken old billings, added new billings on top, and then sent us a new bill. So there wasn't this clean distinction between old claims and old losses and new losses. They got all lumped together. And the panel's interpretation of the scope of what they could do is do great deference. That's what this court said in Runyon. So what they were doing was remedying the situation in paragraph one. It's not a coincidence that the claims that they've precluded from billing asbestos product losses on are the same ones where they violated the course of dealing. They're tied together. Let me follow up on some of this language issue. In paragraph two, petitioners have paid the full amount due. Is it your position that occurrences that have never been presented to even the primary insurance companies, never mind the reinsurers, are somehow due? Or doesn't the phrase the full amount due mean presented claims? Well, I need to back up a second because the reinsurance contracts treat occurrences slightly different than insurance policies do. So the claims we're talking about were aggregate claims, which means they're all the asbestos product claims that were filed against AMCO. If a new one comes in, you know, if John Doe adds his on top, it's that whole collection. And so what the panel was saying is for that collection of claims, since you've violated the course of dealing in the past, you've lost the right to bill them anymore. Now, underwriters had already paid, and this was undisputed, five and a half million dollars on those claims. Continental was seeking to get another million plus. And that panel said, no, you've been paid the five and a half. You violated the course of dealing. The remedy isn't come back and bill us again. I mean, when you get caught with your hand in the cookie jar, you don't just drop the cookie. There's got to be a consequence. And the consequence was for those claims, you can't bill for every other other than the honorable engagement clause. So I take it there is no language in the treaties that would permit cancellation of of reinsurance for this type of business dispute. It's implicit in the treaty under the utmost duty of utmost good faith, as Mr. Song himself, who signed the contracts for Continental, says. And as Continental told the panel at the hearing on more than one occasion, they told the panel in recognition of the traditional duty of utmost good faith, an honorable engagement clause tells you to reach a commercial and pragmatic result. But, but, but, Mr. Let me interrupt you that the first the first the first thing the the first thing the honorable engagement clause says is the arbitrators shall interpret this agreement. So that's what the arbitrators were required to do. Right. They shall interpret this agreement. So they can't. They can't sort of go outside the agreement. Right. I mean, that's what they were required to do. You would agree with that. Right. That's one of the charges to do. But when you look at the first paragraph of the arbitration clause, your honor, it says any dispute about the interpretation of the agreement or any transactions under the agreement. That's where the course of dealing comes in. Those transactions under the agreement for 40 years supplement and add to the agreement. Can I ask you, Mr. I want to make sure I understand the theory here. So this, the, the arbitrators did go with a remedy that needed neither side was asking for. But if we were getting away from arbitration, we can at least, as I understand it, this kind of departure from established practices over 40 years could easily be deemed a breach of just the terms of the contract at that point. And certainly could be deemed a breach of this duty of utmost good faith, undermining confidence of the part of one party and the other. We can I can imagine, as I guess Mr. Psalm said, going in the direction of saying this is such a fundamental breach that we're done. We're we're we're not going to honor any more requests under these contracts. And that would be a kind of global declaration of war under involving thousands of accounts, accounts, and so on. And I can only imagine how complicated the litigation of that in a court might be. I understand you to be suggesting that the arbitrators award might be understood as saying that might be that would that that would be too much. Given the breach here. But some consequences are necessary. And we experienced executives in this field are going to say we need to impose some consequences on a few of these accounts. Risk is slapped to the tune of perhaps several million dollars in this much larger, longer term arrangement. Go forth and send no more. Is that a fair reading? You think of the of the of the award? I think it's a very fair reading. The panel is very constrained in what it could have done. It is, as the facts of the case are, underwriters have paid over one hundred and fifty million dollars under these contracts. And so if the whole thing was to be canceled on a going forward basis, it would be a much larger remedy. And I think the panel understood that because they're businessmen. They've been in need. They know how long term claims evolve. I mean, these were contracts written in the 60s and 70s that the executives who wrote them think would be fighting about them in 2021. No, but we are. And so they have to put their business acumen into the play. And they have to say, what did the people think when they wrote these when they wrote them? The utmost good faith is so important to these relationships. And the courts say it's implied for a reason. The only way reinsurance works, right, because insurance companies adjust the claims and they investigate the claims and they do all the hard work. The reinsurer can't duplicate those efforts. Otherwise, it wouldn't make economic sense to have the reinsurance. So you have to trust the insurance company to do those things properly and to pass the claims along when they get over the retention. And the minute that trust is broken, the whole relationship is called into doubt. That's what that's what Mr. Somme's comment says. The whole relationship is called into jeopardy. And that's where do we find his comments? Could you remind me? His comments are in a reinsurance treatise called Strain on Reinsurance, which was already recited. It was provided to the panel as an exhibit, but I don't think it's in the appellate records. All the exhibits weren't. OK, thank you. Can I ask also, and perhaps Mr. Trello can address this briefly in rebuttal. What do we need to worry about keeping under seal in this record, do you think? I think just the award itself, I believe, is under seal. Obviously, the district court talked a lot about it in its opinion, and that is not under seal. So at this point, there's really not much. The names of the arbitrators and the actual awards. It's a lot more in the briefs, because I went through every single brief in this case and compared the sealed version and the unsealed version. And it seemed like an awful lot of material was sealed that described, for example, so-and-so contended this and somebody else argued that. There were a couple of numbers which, you know, maybe I could imagine sealing, but it seemed to me there was a little much. I find it difficult to believe we should seal the award that's actually in dispute here. You know, in an opinion, however it comes out. OK, thank you. Just to sum up, if there are no more questions, the district court properly found that the panel had broad authority under the Honorable Engagement Clause to issue these remedies and properly confirm the awards. As your honors have noted, the final award has been confirmed. It's not on appeal. The final award is done and dusted. All that we're talking about now are the subsequent orders where the panel clarified exactly what their intention was in the remedy that they were providing, and they're entitled great deference. So unless there's any further questions, I will sit down early. Thank you very much, Mr. Mullins. You don't have to feel bad about doing that at all. So we will return to Mr. Trella, and let me start you off, Mr. Trella, with a question. It really seems, if everybody agrees with this final award, that what you're actually asking for is just a redo on the clarification interpretation part of this. Because if we were to erase the third interim order and the order denying reconsideration, we'd be back to the final award and you'd be back right again with the same interpretation issue that prompted your initial request for clarification. Well, Your Honor, that's correct. And I think that would probably be a matter for another arbitration. We would submit a claim on, say, AMCO, and Lloyd presumably would say, no, that's already been resolved. And we would say, no, it hasn't. And the arbitrators would have to decide. As I noted, you know, that's what we were trying to avoid. And by starting down this road, you know, no good deed goes unpunished, I guess. So that is where we would end up, I think. Mr. Trella, wouldn't we actually have to start over here if the subsequent orders were saying, this is what we meant in the final order? Wouldn't we have to say that in the final order, it's not actually the subsequent orders. We couldn't say, no, the arbitrators got wrong that what they meant in the final order was X. We'd have to say X was wrong. When they said that paragraph 2 meant X, we would have to conclude that they didn't have the authority to decide X. And therefore, the whole arbitration agreement is gone. All right, I'm sorry, the final order is gone. Well, Your Honor, if you concluded that they were, in fact, in the subsequent orders, just clarifying what they meant in the final award, I think the way you've spelled this out is correct. We don't think that's what they were doing. Remember, they denied the motion to clarify. The umpire, immediately after issuing the final award, when we made the motion to clarify, he said, oh, I see Continental's point about future billings. So this idea of banning future billings obviously had not occurred to him before. And then they added the ban on future billings in interim order number 3. So we think that's where the problem lies. But if that was embedded in the final award, then that also exceeds their authority. If I could quickly turn to Judge Hamilton's question about, you know, couldn't the arbitrators have found a breach and a breach sufficiently material to justify this sort of a remedy? I don't think so, and for a number of reasons. First of all, neither side ever suggested that there had been a breach. This was all about how do we compute the amount the reinsurers owe, and that depends on how many retentions do you take. As the district court found, the arbitrators didn't find a breach, much less a material breach. So the judge described Lloyd's argument on that as based on an erroneous premise. And I also should point out that, you know, these bills that were submitted that were supposedly the problem, Lloyd's paid them. It just paid them its way with the multiple retentions rather than one. So there was never any suggestion that, oh, these bills should never have been submitted or there's no coverage here. This all came up after the final award issued and after we filed the motion to clarify. Let me just briefly address the confidentiality issue. We don't really think that there's anything that needs to be sealed. We filed the motion because we were bound by an agreement to keep certain things under seal in court, but I don't think there's any actual commercially sensitive information in the record. If the court has no further questions, I appreciate the opportunity to speak to you this morning. Thank you. All right. Thanks to both counsel. The court will take the case under advisement.